UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JAMES GILMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00082-MPB-MKK |
| | ) | |
| SAMUEL BYRD Dr. MD, | ) | |
| CHELSEA PEARSON Nurse RN, | ) | |
| BARBARA RIGGS Nurse RN  Nursing Sup., | ) | |
| LEANN MURRY Nurse RN, | ) | |
| EMILY ENRIQUEZ Nurse, | ) | |
| KAYLA KELLUMS Nurse, | ) | |
| DANIEL BEDWELL, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING MEDICAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a motion for summary judgment filed by Dr. Samuel

Byrd, and Nurses Chelsea Pearson, Barbara Riggs, Leann Murry, Emily Enriquez, and Kayla

Kellums (collectively the "Medical Defendants"). Dkt. 44. Plaintiff James Gilman, an inmate at

Wabash Valley Correctional Facility, filed this action alleging that the Medical Defendants were

deliberately indifferent to his health care needs in violation of the Eighth Amendment. The Medical

Defendants have raised as an affirmative defense that Plaintiff failed to exhaust administrative

remedies before filing this lawsuit. For the reasons below, the Court **GRANTS** the motion for

summary judgment.

### I. Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way of resolving a

case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no

genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a

1

matter of law. *Id.*; *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II. Factual Background

### A. Plaintiff's Claims

Plaintiff alleges that on November 22, 2022, he submitted a healthcare request because he could tell something was wrong with him. Dkt. 12, p. 2. He was seen by nursing staff on November

2

24, who provided him IV fluids for dehydration and contacted Dr. Byrd, who ordered a blood draw. *Id.* Nurse Pearson, who was assigned to the lab, did not do the blood draw that day or in the following days. *Id.*

Plaintiff became so sick that he was unable to get out of bed by November 25. *Id.* Between November 25 and December 11, he had to be transported to the infirmary by wheelchair. *Id.* He lost nearly 40 pounds in this timeframe. *Id.*

On December 2, Plaintiff had a video chronic care meeting with a nurse practitioner, who immediately contacted on-site medical staff and asked that they have Dr. Byrd assess Plaintiff. *Id.* Dr. Byrd ordered an x-ray of Plaintiff's stomach, which was immediately taken. *Id.* Plaintiff believes that Dr. Byrd should have ordered a doppler scan, using a portable machine available at the prison, because he should have known that an abscess and bowel issues would not have been visible on an x-ray. *Id.* at pp. 2-3. Dr. Byrd had Plaintiff lay on an exam table and started roughly pushing on his abdomen. *Id.* at p. 3. Dr. Byrd ordered lactulose and MiraLAX to treat constipation and reordered blood labs. *Id.* Dr. Byrd later admitted to Plaintiff that if the abscess had ruptured before Plaintiff was sent to the hospital, Plaintiff would have died.[1] *Id.*

On December 6, a correctional officer called to the infirmary to ask that Plaintiff be admitted, but Nurse Murry refused to allow him to be escorted there. *Id.* On December 10, another officer called the infirmary asking for Plaintiff to be admitted, but Nurse Enriquez refused and told Plaintiff to give himself another enema. *Id.* On December 11, two officers called the infirmary, the second explaining her belief that Plaintiff would die if he wasn't attended to by medical staff. Nurse Murry refused to allow them to escort Plaintiff to the infirmary. *Id.* A correctional officer then

---

[1] Dr. Byrd entered a general denial of this allegation in his answer to Plaintiff's complaint. Dkt. 33, p. 2.

called Nurse Riggs, the nursing supervisor, and told her that Plaintiff would die without medical attention, but Nurse Riggs refused to allow his transport to the infirmary. *Id.*

In the evening of December 11, after a shift change, a correctional officer was able to convince a night shift nurse to have Plaintiff admitted. *Id.* At the infirmary, the nurse couldn't get Plaintiff's blood pressure, so she called Dr. Byrd. *Id.* Dr. Byrd looked up Plaintiff's blood test results (which Nurse Pearson had taken on December 6). *Id.* The test results showed a 15+ white blood count, which indicated a serious infection. *Id.* Dr. Byrd ordered that Plaintiff be taken to an area hospital by ambulance. *Id.*

At the hospital, Plaintiff was diagnosed with a 15.5 cm abdominal abscess. *Id.* The abscess was too large to be drained, and on December 25, 2022, a surgeon removed the abscess and dissected 2 centimeters of Plaintiff's bowel. *Id.*

Plaintiff was returned to Wabash Valley on December 31, 2022. Dkt. 40, p. 2. He remained in the prison infirmary for post-surgical care and preventative COVID isolation until January 13, 2023. *Id.*

**B. The Grievance Process**

The Indiana Department of Correction ("IDOC") maintains an Offender Grievance Process, the current version of which has been in place state-wide since September 2020. Dkt. 46-1, p. 2. To exhaust the grievance process, an inmate must (1) file a grievance on the approved form; (2) pursue an appeal of an unfavorable outcome to the prison warden or the warden's designee; and (3) if that appeal is unsatisfactory, pursue an appeal to the IDOC Offender Grievance Manager. *Id.* To timely initiate the grievance process, an inmate must submit the required grievance form to the prison's grievance specialist no later than ten (10) business days after the

incident at issue. *Id.* The Offender Grievance Process specifies that certain issues are "non-grievable," including "Tort Claims seeking monetary compensation . . . ." *Id.* at p. 9.

The Process also states that a grievance "form may be returned to the offender if it was not submitted within the ten (10) business day time limit or it is grieving a matter inappropriate to the offender grievance process." *Id.* at 15. There is no apparent process to appeal or resubmit a "return" of a grievance for either of these reasons.

The Process allows for the possibility that a late grievance may nonetheless be accepted if the prisoner can show good cause for the late filing. *See id.* at p. 19. The Process specifies, "[i]f there are extenuating circumstances which caused the offender a delay in submitting the grievance form within the time frames, the offender must document and submit the reason for the delay on a separate piece of paper with signature and date . . . ." *Id.*

### C. Plaintiff's Grievance

Plaintiff filed a grievance related to this complaint on February 2, 2023.[2] In it, Plaintiff said in part:

> There can be no relief in this instance because the incident occurred in November 2022, to December 11, 2022, which required surgery at Union Hospital to save my life. There is nothing that can be done to prevent the Deliberate Indifference to my serious medical condition that was done between November 29, 2022 to December 11, 2022 by medical staff. This grievance is only being submitted to comply to ADEPA requirements prior to filing a § 1983 Civil Complaint, and for your notice of pending lawsuit.

*Id.* at p. 23. The grievance specialist returned the grievance, marking boxes on the return form indicating that it was not timely submitted. *Id.* at p. 25. The specialist also wrote on the form, "no relief available or sought?" *Id.*

---

[2] The IDOC stamp on the grievance indicates it was received on February 7, 2023. The Court will assume for the sake of summary judgment that Plaintiff actually submitted it on the date he indicated on the form, or February 2, 2023. *See* dkt. 46-1, p. 23.

### III. Discussion

#### A. Exhaustion Requirement

The Prison Litigation Reform Act requires that a prisoner exhaust available administrative remedies before suing over prison conditions. 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). "To exhaust administrative remedies, a prisoner must comply strictly with the prison's administrative rules by filing grievances and appeals as the rules dictate." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) (*citing Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006)). A "prisoner must submit inmate complaints and appeals 'in the place, and at the time, the prison's administrative rules require.'" *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)).

Although the exhaustion requirement is strict, it "hinges on the availability of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (internal quotation omitted). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Id.* Thus, "exhaustion is not required when the prison officials responsible for providing grievance forms refuse to give a prisoner the forms necessary to file an administrative grievance." *Hill v. Snyder,* 817 F.3d 1037, 1041 (7th Cir. 2016).

"Because exhaustion is an affirmative defense," the defendants face the burden of establishing that "an administrative remedy was available and that [Plaintiff] failed to pursue it." *Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015). "[A]n inmate is required to exhaust those, but

only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (internal quotation omitted). "[A] prisoner need not exhaust 'where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint.'" *Dowaun v. Wexford Health Sources, Inc.*, No. 21-2957, 2023 WL 5348345, at *2 (7th Cir. Aug. 21, 2023) (quoting *Booth v. Churner*, 532 U.S. 731, 736 (2001)).

### B. Plaintiff's Use of the Offender Grievance Process

### 1. Did the Process Apply to Plaintiff's Claims?

The threshold issue the Court must address is whether Plaintiff was required at all to use the Offender Grievance Process as a prerequisite to filing this lawsuit. Plaintiff argues that there was no need for him to exhaust administrative remedies, because he intended to seek monetary damages and the grievance process could not grant him such relief. He further contends that the only effective remedy the IDOC grievance process could only have provided would have been to mandate that he receive adequate medical care, which he did receive when he was finally transported to the hospital and had surgery.

Plaintiff directs the Court in part to the Offender Grievance Process's statement listing "Tort Claims seeking monetary compensation" as a non-grievable issue. Dkt. 46-1, p. 9. He also claims that grievance officials essentially have a practice and policy of delaying or denying medical grievances without justification. But exhaustion is required even if the prisoner believes his efforts in securing relief will be futile, or if the administrative authority has no power to grant the requested relief. *Obriecht v. Raemisch*, 517 F.3d 489, 492 (7th Cir. 2008). More to the point, the United States Supreme Court has made it very clear that under the PLRA, exhaustion of administrative remedies is required as a prerequisite to a lawsuit, even if a prisoner's lawsuit is

solely seeking relief that could not have been obtained through the grievance process. *Booth*, 532 U.S. at 740–41.

In other words, the relevant question is whether a grievance by Plaintiff could have generated any relief or response by the IDOC or Wabash Valley at all—not whether it could have generated the specific monetary-only relief Plaintiff seeks in this lawsuit. And the Offender Grievance Process indicates that this is the case. For example, in response to a grievance, the IDOC may "[r]eview and/or revise Department or facility procedures or practices," or the warden may "[p]rovide other remedies as deemed appropriate . . . ." Dkt. 46-1, p. 12.

Plaintiff also points out that the grievance specialist wrote on his grievance, "no relief available or sought?" *Id.* at 25. The question mark indicates that the specialist was responding to Plaintiff's statements that he was only filing the grievance as a formality and prelude to a lawsuit, not that in fact nothing could be done in response to the grievance. In other words, Plaintiff could have re-worded his grievance to request relief that was allowed by the Process, even if it was just a "formality" to do so. *Booth* clearly requires exhaustion, regardless of the relief an inmate ultimately wants.

Additionally, this Court has repeatedly held that the Offender Grievance Process's exclusion of "Tort Claims seeking monetary compensation" applies only to claims intended to be filed under the Indiana Tort Claims Act, not § 1983 claims or other claims that might be related to tortious conduct. *See Kelly v. Wilks*, No. 1:22-CV-01256-TWP-MJD, 2023 WL 8543746, at *5 (S.D. Ind. Dec. 11, 2023); *Payton v. Talbot*, No. 1:18-CV-03858-JRS-DLP, 2019 WL 5965236, at *4 (S.D. Ind. Nov. 13, 2019); *Hall v. Lunsford*, No. 1:17-CV-02945-SEB-MPB, 2019 WL 1077600, at *5 (S.D. Ind. Mar. 6, 2019); *Ogle v. Brown*, No. 2:16-CV-00083-LJM-DKL, 2016 WL 6163462, at *1 (S.D. Ind. Oct. 24, 2016). Plaintiff's complaint is based squarely upon alleged

violations of the Eighth Amendment, not Indiana tort law, and so is unequivocally a § 1983 action. The Court concludes that under the PLRA, Plaintiff had to at the very least timely seek administrative remedies as outlined in the Offender Grievance Process before filing suit when he was physically able to do so.[3]

### 2. Did Plaintiff Comply with the Process?

Viewing the designated evidence in a light most favorable to Plaintiff, the Court assumes that the grievance process effectively was "unavailable" to him through, at the latest, January 13, 2023, when he was released from the Wabash Valley infirmary. *See Smallwood v. Williams*, 59 F.4th 306, 314 (7th Cir. 2023) (holding that a prisoner's poor physical and/or mental health during the time frame in which a grievance had to be initiated may make the grievance process effectively "unavailable" to the prisoner during that time).

The Medical Defendants argue that Plaintiff could have filed a grievance within 10 business days of his release from the Wabash Valley infirmary on January 13, and he did not do so. When a medical issue prevents an inmate from timely filing a grievance, he or she must present evidence of filing a grievance and attempting to exhaust administrative remedies as soon as it was reasonably possible to do so. *Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011). Plaintiff does not argue that his health after being released from the infirmary prevented him from completing a grievance. Also, although he asserted in the grievance that he was delayed in filing it because of a need to gather medical evidence in support of it, Indiana's grievance policy does not require specific documentary evidence to file a formal grievance. *See Williams v. Rajoli*, 44 F.4th 1041,

---

[3] The Court acknowledges that in *Dowaun v. Wexford Health Sources, Inc.*, No. 21-2957, 2023 WL 5348345, at *2 (7th Cir. Aug. 21, 2023) (citing *Thornton v. Snyder*, 428 F.3d 690, 695 (7th Cir. 2005)), the Seventh Circuit held that a prisoner was not required to appeal a grievance related to delayed medical treatment, where the prisoner did in fact receive the necessary treatment but later filed a deliberate indifference suit seeking damages based on a delay in treatment. Here, however, Plaintiff did not initiate the grievance process at all until after the deadline for doing so had passed.

1046 (7th Cir. 2022). If there is any doubt as to when or whether to file a grievance, an inmate should "err on the side of exhaustion" and timely initiate the grievance process. *Id.* (quoting *Ross v. Blake*, 578 U.S. 632, 644 (2016)). It is unclear why Plaintiff could not have initiated a formal grievance no later than 10 business days after being released from the infirmary, particularly as Plaintiff plainly was aware of the 10-day time limit.

Although the Offender Grievance Process allows for the possibility that a late grievance may nonetheless be accepted if the prisoner can show good cause for the late filing, Plaintiff did not follow this procedure or advise the grievance specialist that he was seeking a "good cause" excuse for the late filing.[4] Even assuming that Plaintiff had good cause for a late filing for 10 business days beyond December 11, 2022, the Court cannot discern evidence in the record, or in his grievance filing, that would establish good cause for extending it for more than 10 business days beyond January 13, 2023.

## IV. Conclusion

For the reasons given above, the motion for summary judgment filed by Dr. Samuel Byrd, and Nurses Chelsea Pearson, Barbara Riggs, Leann Murry, Emily Enriquez, and Kayla Kellums, dkt. [44], is **GRANTED**. All claims against these defendants are **dismissed without prejudice** and the **clerk is directed** to terminate them as defendants on the docket.

The Court recently granted Plaintiff leave to amend his complaint to add a new defendant, Daniel Bedwell, a food service provider against whom the claims are different than those against

---

[4] The present case is unlike *Lanaghan v. Koch*, 902 F.3d 683, 690 (7th Cir. 2018), in which an Illinois prison failed to inform an inmate that he could seek to file a late grievance for "good cause" and so the Seventh Circuit excused the inmate's failure to try to file a grievance beyond the deadline. IDOC's "good cause" provision is spelled out in the Offender Grievance Process.

the Medical Defendants. Dkt. 56. That claim remains pending.

**IT IS SO ORDERED.**

Dated:  February 14, 2024

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

JAMES GILMAN
110906
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only